```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA        :
                                       INFORMATION
          - v. -                :
                                       08 CRIM 711
ANDREW SMULIAN,                 :

              Defendant.        :

- - - - - - - - - - - - - - - - -X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 30 2008

COUNT ONE

CONSPIRACY TO KILL UNITED STATES NATIONALS

The United States Attorney charges:

BACKGROUND TO THE CONSPIRACY

*Fuerzas Armadas
Revolucionarias de Colombia*

1.  From in or about 1964 until on or about the date of filing of this Information, the Fuerzas Armadas Revolucionarias de Colombia (hereinafter, the "FARC") has been and is an international terrorist group dedicated to the violent overthrow of the democratically elected Government of Colombia. Since its inception, while continuing to engage in bombings, massacres, kidnappings, and other acts of violence within Colombia, the FARC also evolved into the world's largest supplier of cocaine. In October 1997, the United States Secretary of State designated the FARC as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act. The Secretary of State redesignated the FARC as a foreign terrorist organization on October 2, 2003, and October 11, 2005. As of the date of filing

of this Information, the FARC is designated as a foreign terrorist organization. The European Union also has designated the FARC as a terrorist organization.

2. During at least the five years prior to the date of filing of this Information, the FARC has directed violent acts against United States persons and property interests in foreign jurisdictions, including, but not limited to, Colombia. In order to protect its financial interests in the cocaine trade, the FARC leadership ordered its members to take counter measures against the Government of Colombia's cocaine fumigation campaign, including, among other actions: attempting to shoot down fumigation aircraft; forcing members and supporters to publicly rally against fumigation; and attacking Colombian infrastructure. Having recognized that the United States contributed significantly to Colombian fumigation efforts, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

3. The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States

nationals; and (3) the bombing of a restaurant in Bogota, Colombia, frequented by United States nationals.

### THE CONSPIRACY TO KILL UNITED STATES NATIONALS

4. From at least in or about November 2007, up to and including in or about March 2008, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ANDREW SMULIAN, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed together and with each other to kill nationals of the United States, in violation of Title 18, United States Code, Section 2332(b).

5. It was a part and an object of the conspiracy that ANDREW SMULIAN, the defendant, and others known and unknown, agreed to provide the FARC with millions of dollars' worth of weapons to be used, among other things, to kill nationals of the United States in Colombia.

### Overt Acts

6. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed:

    a. On or about January 10, 2008, and on or about January 11, 2008, ANDREW SMULIAN, the defendant, met with three confidential sources working with the United States Drug

Enforcement Administration (the "DEA") in Curacao, Netherlands Antilles, to discuss the sale of millions of dollars' worth of weapons to the FARC. (The confidential sources will, hereinafter, be referred to as "CS-1," "CS-2," "CS-3" or, collectively, as "CSs").

      b. On or about January 10, 2008, CS-2 and CS-3 told SMULIAN that they represented the FARC, and that the FARC needed weapons to fight against the United States in Colombia.

      c. On or about January 11, 2008, CS-2 and CS-3 provided SMULIAN with $5,000 in cash as compensation for SMULIAN's travel and expenses incurred in meeting with CS-2 and CS-3.

      d. On or about January 21, 2008, SMULIAN met with an unnamed co-conspirator ("CC-1") in Moscow, Russia, to discuss the arms deal with the FARC proposed by CS-2 and CS-3.

      e. On or about January 22, 2008, and January 23, 2008, SMULIAN met with CS-1 and CS-2 in Copenhagen, Denmark, to discuss SMULIAN's recent meeting with CC-1 in Moscow, Russia, regarding the arms deal.

      f. On or about January 22, 2008, during a meeting in Denmark, SMULIAN told CS-1 that CC-1 had instructed SMULIAN to set up a meeting to discuss the arms deal.

      g. On or about January 23, 2008, during a meeting in Denmark, SMULIAN told CS-2 that the weapons supplier SMULIAN

had been talking about was CC-1, and then spelled CC-1's last name and told CS-2 that CC-1 was known as the "merchant of death."

  h. On or about January 23, 2008, during a meeting in Denmark, SMULIAN informed CS-2 that, during his meeting with CC-1 in Russia, CC-1 had shown SMULIAN photographs of senior officers in the FARC and asked SMULIAN to identify CS-2 and CS-3 from the photographs.

  i. On or about January 23, 2008, during a meeting in Denmark, SMULIAN advised CS-1 and CS-2, in coded language, that 100 surface-to-air missiles were available immediately.

  j. On or about January 23, 2008, during a meeting in Denmark, SMULIAN advised CS-1 and CS-2 that a delivery system was already in place for the arms and that the arms could be airdropped with great accuracy.

  k. On or about January 26, 2008, SMULIAN traveled with CS-1 to Bucharest, Romania, to meet with CS-2 and CS-3 to further discuss the arms deal with the FARC.

  l. From on or about January 26, 2008, through on or about February 7, 2008, SMULIAN had a series of meetings with the CSs in Bucharest, Romania, where they continued to discuss the arms deal with CC-1.

  m. On or about January 26, 2008, during a meeting with the CSs in Romania, SMULIAN handed his cellphone to CS-3,

and CS-3 and CC-1 then spoke for several minutes about meeting in person to discuss the arms deal.

    n.  On or about January 26, 2008, during a meeting with the CSs in Romania, SMULIAN informed the CSs that CC-1 had 100 Igla surface-to-air missiles available immediately.

    o.  On or about January 26, 2008, during a meeting with the CSs in Romania, SMULIAN showed the CSs photographs of Igla surface-to-air missiles on his laptop computer, which listed the specifications of the missiles.

    p.  On or about January 26, 2008, during a meeting with the CSs in Romania, SMULIAN advised the CSs that CC-1 could provide special helicopters that are superior to U.S. helicopters, as well as training for using the helicopters.

    q.  On or about January 26, 2008, during a meeting with the CSs in Romania, SMULIAN informed the CSs that the weapons they had been discussing were in Bulgaria, and it would cost $5 million to transport them.

    r.  On or about January 27, 2008, during a meeting with CS-1 and CS-2 in Romania, SMULIAN advised that CC-1 could provide armor-piercing rocket launchers, pictures of which SMULIAN showed CS-1 and CS-2 on a laptop computer.

    s.  On or about January 28, 2008, during a meeting with CS-1 and CS-2 in Romania, SMULIAN provided CS-2 with a digital memory stick that contained an article about CC-1, and

documents containing photographs and specifications for the Igla surface-to-air missiles and armor-piercing rocket launchers that SMULIAN had previously said CC-1 could provide.

   t. On or about January 30, 2008, SMULIAN called CC-1 from Romania, and they discussed the arms deal, including the $5 million transportation fee.

   u. On or about February 4, 2008, during a meeting with CS-2 in Romania, SMULIAN advised CS-2 that CC-1 could airdrop the weapons over Colombian territory.

   v. On or about February 4, 2008, during a meeting with CS-2 in Romania, SMULIAN discussed the current troop levels of the FARC and the number of weapons needed to fully arm the FARC.

   w. On or about February 7, 2008, during a meeting with CS-2 in Romania, SMULIAN called CC-1 so that CC-1 and CS-2 could speak directly about the arms deal.

   x. On or about February 7, 2008, CC-1 spoke with CS-2 over the telephone about the arms deal, and CC-1 indicated that he was interested in meeting to discuss the arms deal in the coming weeks.

   y. On or about February 7, 2008, during a meeting in Romania, CS-2 provided SMULIAN with an email address (the "Email Address") for CC-1 and SMULIAN to use to contact CS-2 in the future.

        z.  On or about February 12, 2008, CS-2 received an email at the Email Address from CC-1 indicating that CS-2 could use the sending email address to communicate with CC-1.

        aa.  On or about February 18, 2008, CS-2 received an email at the Email Address from SMULIAN asking, in coded language, if CS-2 had received the email from CC-1.

        bb.  Between on or about February 21, 2008, and on or about February 25, 2008, CC-1 spoke with CS-2 over the telephone approximately three times, and indicated that he would meet CS-2 and CS-3 in Bangkok, Thailand on March 6, 2008 to discuss the arms deal.

        cc.  On or about March 6, 2008, SMULIAN, CC-1, and an unnamed associate of CC-1's met with CS-2 and CS-3 at a hotel in Bangkok, Thailand for approximately two hours to discuss the details of the arms deal.

        dd.  On or about March 6, 2008, during the meeting in Thailand, CC-1 expressed his sympathies to CS-2 for the recent deaths of two FARC commanders.

        ee.  On or about March 6, 2008, during the meeting in Thailand, CC-1 indicated that he understood that CS-2 and CS-3 wanted the arms for use against U.S. forces in Colombia, and advised that the United States was also his enemy.

        ff.  On or about March 6, 2008, during the meeting in Thailand, when CS-2 and CS-3 advised CC-1 that the FARC needed

8

anti-aircraft weapons to kill American pilots, CC-1 said that he was going to prepare everything the FARC needed.

gg. On or about March 6, 2008, during the meeting in Thailand, after CS-3 explained that the FARC wanted to kill American forces in Colombia, CC-1 indicated that the fight against the United States was also his fight and that he intended to supply the FARC with arms.

hh. On or about March 6, 2008, during the meeting in Thailand, CC-1 indicated that he could supply the FARC with the following arms and vehicles: (1) 700 to 800 surface-to-air missiles; (2) 5,000 AK-47 firearms; (3) millions of rounds of ammunition; (4) various Russian spare parts for rifles; (5) anti-personnel land mines and C-4 explosives; (6) night-vision equipment; (7) "ultralight" airplanes, which could be outfitted with grenade launchers and missiles; and (8) unmanned aerial vehicles, which have a range of 200 to 300 kilometers.

ii. On or about March 6, 2008, during the meeting in Thailand, CC-1 offered to provide people to train the FARC in the use of the arms.

jj. On or about March 6, 2008, during the meeting in Thailand, CC-1 stated that he could arrange to airdrop the arms to the FARC in Colombia, and drew a diagram for CS-2 and CS-3 to explain the delivery route.

kk. On or about March 6, 2008, during the meeting in Thailand, CC-1 provided CS-2 and CS-3 with a map of South America, and asked CS-2 and CS-3 to show him American radar locations in Colombia.

ll. On or about March 6, 2008, during the meeting in Thailand, CC-1 offered to sell two cargo planes to the FARC that could be used for arms deliveries, and showed CS-2 and CS-3 a pamphlet describing one of the cargo planes.

mm. On or about March 6, 2008, during the meeting in Thailand, when CS-2 asked CC-1 how much money CC-1 would need to begin supplying the arms, CC-1 said that it would cost at least fifteen or twenty million, without specifying a currency.

nn. On or about March 6, 2008, during the meeting in Thailand, CC-1 discussed potential locations for his next meeting with the CSs, including Panama, Nicaragua, and Moldova.

(Title 18, United States Code, Sections 2332(b) and 3238.)

## COUNT TWO

## CONSPIRACY TO KILL OFFICERS AND EMPLOYEES OF THE UNITED STATES

The United States Attorney further charges:

7. The allegations set forth in Paragraphs One through Three above are incorporated by reference as if set forth fully herein.

8. From at least in or about November 2007, up to and including in or about March 2008, in an offense begun and

committed outside of the jurisdiction of any particular State or district of the United States, ANDREW SMULIAN, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed together and with each other to kill officers and employees of the United States, while such officers and employees were engaged in and on account of the performance of official duties, and any person assisting such officers and employees in the performance of such duties and on account of that assistance, in violation of Title 18, United States Code, Section 1114.

    9.   It was a part and an object of the conspiracy that ANDREW SMULIAN, the defendant, and others known and unknown, agreed to provide the FARC with millions of dollars' worth of weapons to be used, among other things, to kill officers and employees of the United States, and persons assisting such officers and employees in the performance of official duties, in Colombia.

Overt Acts

10. In furtherance of the conspiracy and to effect the illegal object thereof, ANDREW SMULIAN, the defendant, and others known and unknown, committed the overt acts set forth in Count One of this Information, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 1114, 1117, and 3238.)

COUNT THREE

CONSPIRACY TO ACQUIRE AND USE ANTI-AIRCRAFT MISSILES

The United States Attorney further charges:

11. The allegations set forth in Paragraphs One through Three above are incorporated by reference as if set forth fully herein.

12. From at least in or about November 2007, up to and including in or about March 2008, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ANDREW SMULIAN, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to produce, construct, otherwise acquire, transfer directly and indirectly, receive, possess, import, and use (1) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and

proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft; (2) a device designed and intended to launch and guide said rocket and missile; and (3) a part and combination of parts designed and redesigned for use in assembling and fabricating said rocket, missile, and device.

13.  It was a part and an object of the conspiracy that ANDREW SMULIAN, the defendant, and others known and unknown, agreed to acquire and export surface-to-air missile systems to enable the FARC to attack United States aircraft in Colombia, in violation of Title 18, United States Code, Section 2332g.

Overt Acts

14.  In furtherance of the conspiracy and to effect the illegal object thereof, ANDREW SMULIAN, the defendant, and others known and unknown, committed the overt acts set forth in Count One of this Information, which are fully incorporated by reference herein.

(Title 18, United States Code,<br>Sections 2332g(a)(1), (b), and 3238.)

## COUNT FOUR

### CONSPIRACY TO PROVIDE MATERIAL SUPPORT OR RESOURCES TO A FOREIGN TERRORIST ORGANIZATION

The United States Attorney further charges:

15. The allegations set forth in Paragraphs One through Three above are incorporated by reference as if set forth fully herein.

16. From at least in or about November 2007, up to and including in or about March 2008, in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, ANDREW SMULIAN, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, the FARC, which was designated by the United States Secretary of State as a foreign terrorist organization in October 1997, pursuant to Section 219 of the Immigration and Nationality Act, was redesignated as such on October 2, 2003, and October 11, 2005, and is currently designated as such, as of the date of filing of this Information.

17. It was a part and an object of the conspiracy that ANDREW SMULIAN, the defendant, and others known and unknown, agreed to provide the FARC with millions of dollars' worth of

14

weapons for the FARC to use to protect their cocaine trafficking business and to attack United States interests in Colombia, knowing that the FARC had engaged and was engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

### Overt Acts

18. In furtherance of the conspiracy and to effect the illegal object thereof, ANDREW SMULIAN, the defendant, and others known and unknown, committed the overt acts set forth in Count One of this Information, which are fully incorporated by reference herein.

>  (Title 18, United States Code,
>  Sections 2339B(a)(1), (d)(1) and 3238).

### FORFEITURE ALLEGATIONS

19. The allegations contained in Counts One, Two, Three, and Four of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c).

20. The violations of Title 18, United States Code, Sections 2332(b), 1114, 2332g, and 2339B alleged in Counts One, Two, Three, and Four of this Information were Federal crimes of terrorism, as defined in 18 U.S.C. § 2332b(g)(5), against the United States, citizens and residents of the United States, and their property.

21. ANDREW SMULIAN, the defendant, was an individual engaged in planning and perpetrating a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property.

22. Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 2332(b), 1114, 2332g, and 2339B alleged in Counts One, Two, Three, and Four of this Information, ANDREW SMULIAN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i), and Title 28, United States Code, Section 2461(c), all right, title, and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property.

23. Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 2332(b), 1114, 2332g, and 2339B alleged in Counts One, Two, Three, and

Four of this Information, ANDREW SMULIAN, the defendant, shall pay to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c), a money judgment equal to the value of the assets subject to forfeiture under Paragraphs 21 through 24 above.

    (Title 18, United States Code, Section 981(a)(1)(G) and
       Title 28, United States Code, Section 2461(c).)

                                      */s/ Michael J. Garcia*
                                      MICHAEL J. GARCIA
                                      United States Attorney

Deft: Arraignment & Waiver of
Indictment. Deft. pres w/atty
Jy Mulligan & Brendan McGuire
Deft Pleads Not guilty. Detention Cont'd.
+ mag judge Katz