UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA,          :
                                  :

                  Plaintiff,    :          No. 08-CR-711 (RJS)
                                  :

        v.                          :

ANDREW SMULIAN              :

                  Defendant.   :
                                  :
                                  :
                                  :
                                  :
------------------------------------------------------------x

## SENTENCING MEMORANDUM ON BEHALF OF
## ANDREW SMULIAN

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
Mary E. Mulligan, Esq.
7 Times Square
New York, NY 10036-6516
(212) 833-1100

*Attorney for Defendant Andrew Smulian*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

I.      PROCEDURAL BACKGROUND..............................................................1

        A.      Mr. Smulian's Offense Conduct ....................................................2

        B.      Cooperation with the Government's Prosecution .......................3

                1.      Nature and Extent, Truthfulness and Timeliness
                        of Mr. Smulian's Assistance ..............................................4

                2.      Significance and Usefulness of the Assistance ....................5

                3.      Danger or Risk of Injury to Mr. Smulian and
                        His Family Resulting From His Assistance ...........................6

II.     MR. SMULIAN'S PERSONAL BACKGROUND.....................................7

        A.      Upbringing, Education and Aviation Career ...............................7

        B.      Reversal of Fortune........................................................................7

        C.      Father, Grandfather, Husband, Brother and Son.........................9

III.    A SENTENCE OF TIME SERVED IS APPROPRIATE UNDER
        THE CIRCUMSTANCES .........................................................................10

        A.      Applicable Legal Principles.........................................................10

                1.      Post-Booker Use of the Sentencing Guidelines ..................10

                2.      18 U.S.C. § 3553(a) Factors.................................................11

        B.      A Sentence of Time Served is Warranted in Light of § 3553(a)
                Factors..........................................................................................11

                1.      There is No Likelihood of Recidivism...............................11

                        a.      Mr. Smulian's Cooperation with the Government...................11

                        b.      Mr. Smulian's Advanced Age...................................11

                2.      Mr. Smulian's Reduced Life Expectancy Warrants a
                        Non-Prison Sentence............................................................12

                3.      Self-Motivated Path to Rehabilitation .................................15

                4.      Time Served in SHU is Sufficient Punishment....................16

                5.      Mr. Smulian's Cooperation
                        Warrants a Sentence of Time Served ...................................17

IV.     CONCLUSION........................................................................................20

**EXHIBITS**

Defendant's Sentencing Memorandum in *United States v. Viktor Bout* ...........Exhibit 1

Letter of Andrew Smulian (handwritten)............................................................Exhibit 2

Letter of Andrew Smulian (typed by counsel)..................................................Exhibit 2A

Letter of ██████████ ...............................................................................Exhibit 3

Letter of ████████ .................................................................................Exhibit 4

Letter of █████████ ..............................................................................Exhibit 5

Letter of █████████ ..............................................................................Exhibit 6

Letter of █████████ ..............................................................................Exhibit 7

Smulian Medical History and Prescription List (as of December 3, 2011)......Exhibit 8

2004 Bureau of Prisons Recidivism Report .....................................................Exhibit 9

Smulian Vital Statistics (March 2008 – December 2011) ..............................Exhibit 10

Smulian Blood Tests (selected from April 2008 – November 2011) ..............Exhibit 11

Smulian Medical Examination Report – October 4, 2011 ...............................Exhibit 12

Associations of Diabetes Mellitus With Total Life Expectancy
        (O. Franco) ...........................................................................................Exhibit 13

Development of Life Expectancy Tables for People with Type 2 Diabetes
        (J. Leal) ................................................................................................Exhibit 14

Smulian Book List ...........................................................................................Exhibit 15

Letter of ██████████ ...............................................................................Exhibit 16

2007 Social Security Administration Actuarial Life Table ............................Exhibit 17

Letter of █████████ .................................................................................Exhibit 18

Transcript of Sentencing in *United States v. Mendola*, 03 Cr. 449 (KMW)
        (S.D.N.Y. Sept. 30, 2005) (relevant portions) .....................................Exhibit 19

Transcript of Sentencing in *United States v. Pajcin*, 05 Cr. 1284 (VM)
        (S.D.N.Y. Jan. 18, 2008) (relevant portions).......................................Exhibit 20

Opinion and Order in *United States v. Bout*, 08 Cr. 365 (SAS)
        (S.D.N.Y. Feb. 24, 2012)......................................................................Exhibit 21

Transcript of Sentencing in *United States v. Stephanou*, 09 Cr. 467 (RJS)
    (S.D.N.Y. Dec. 22, 2010) (relevant portions).....................................Exhibit 22

Handwritten Chart of Mr. Smulian's Blood Sugar Levels ..............................Exhibit 23

*United States v. Barrera-De Amaris, et al.,* 03 Cr. 182
    (S.D. Tex. May 21, 2003)....................................................................Exhibit 24

*United States v. Shah, et al.*, 02 Cr. 2912-L (S.D. Cal. Oct. 30, 2002)
    (relevant proceedings)........................................................................Exhibit 25

*United States v. Royer, et al.*, 03 Cr. 296-A (E.D. Va. June 25, 2003),
    *see United States v. Khan*, 309 F. Supp. 2d 789 (E.D. Va. 2004)
    (relevant proceedings)........................................................................Exhibit 26

*United States v. Ujaama*, 02 Cr. 283
    (W.D. Wash. Aug. 28, 2002) (relevant proceedings) ..........................Exhibit 27

*United States v. Babar*, 04 Cr. 528 (VM) (S.D.N.Y. June 3, 2004)
    (relevant excerpt) ..............................................................................Exhibit 28

## PRELIMINARY STATEMENT

We respectfully submit this memorandum in connection with the sentencing of our client Andrew Smulian scheduled for Monday, April 30, 2012.[1] Pursuant to 18 U.S.C. § 3553(a), we request that Your Honor impose a sentence of time served. As of April 30, 2012, Mr. Smulian will have spent over four years in prison. As set forth in more detail below, we submit that the requested sentence is sufficient and appropriate to satisfy the goals of sentencing because:

- Mr. Smulian has cooperated and rendered substantial assistance to the U.S. Government, and we understand that the Government intends to move for a downward departure pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("Guidelines") and 18 U.S.C. § 3553(e) from the applicable Guidelines range;

- There is no risk of recidivism;

- Mr. Smulian's reduced life expectancy due to serious medical conditions warrants a variance to ensure that he is not effectively sentenced to life in prison;

- Mr. Smulian has accepted full responsibility for his criminal activity and has undergone an admirable personal transformation during his incarceration; and

- Mr. Smulian has been substantially punished already, having served over four years in harsh conditions in the special housing unit ("SHU") of the Metropolitan Correctional Center ("MCC").

## I.  PROCEDURAL BACKGROUND

Mr. Smulian is a British and South African national and career aviation professional, having worked as a pilot, airport director, independent consultant and owner of a once profitable air freight company over the course of almost fifty years.

Mr. Smulian was introduced to Viktor Bout in 1997 shortly after Bout came to South Africa looking for an airport to serve as a base for his cargo transporting operations. He was introduced to Bout through a mutual acquaintance associated with the aviation industry. Mr. Smulian testified at trial, it was his understanding that Bout was transporting food aid at this time. (Tr. 1127-28). On Bout's behalf, Mr. Smulian negotiated with an airfield in Pietersburg and obtained rights for Bout to use it as a base. (*Id.* at 1126-27). During that time, Mr. Smulian assisted Bout in setting up operations in

---

[1] "Tr. __" refers to the transcript of the trial of Viktor Bout from October 17 to November 2, 2011; "PSR" refers to the Draft Presentence Investigation Report, dated January 26, 2012; and "Ex. __" refers to the exhibits attached to this sentencing memorandum.

Swaziland and Zambia.  In 1997, Bout took Smulian to IDEX (the International Defense Exhibition and Conference) held in Dubai.

In 1998, Bout relocated to the Central Africa Republic.  From 1998 to around September 2007, Mr. Smulian and Bout had no contact or dealings other than some infrequent emails of a social nature.  (*Id.* at 1132-33).

In late 2007, while working in a medical hypodermic syringe factory operated by a friend in Dar es Salaam, Tanzania, Mr. Smulian reached out to Bout with the hopes of obtaining his participation in a variety of investment opportunities in Tanzania, including a cement factory, oil exploration, and the provision of arms for the government's defense force.  (Tr. 1137).  While Bout and Mr. Smulian were in discussions regarding these ventures, Mr. Smulian was contacted via email by a former colleague turned DEA informant, Mike Snow, who was tasked with setting the groundwork for the sting operation to ensnare Bout.

### A.    **Mr. Smulian's Offense Conduct**

Specifically, in November 2007, Snow contacted Mr. Smulian to convey a proposal for an arms transaction to Bout, who was then residing in Russia.  The proposal involved the provision of arms to the Fuerzas Armadas Revolucionarias de Colombia (FARC), a U.S. and E.U.-designated foreign terrorist organization.  (PSR ¶ 12).  Upon learning of the weapons proposal from Mr. Smulian over email, Bout accepted and authorized Smulian to meet with his contacts to pursue the transaction.  Shortly thereafter on January 10, 2008, Mr. Smulian traveled to Curacao, Netherlands Antilles to meet with Snow and two DEA confidential sources posing as representatives of the FARC.  During the meetings in Curacao, the confidential sources explained to Mr. Smulian that the FARC sought an arsenal of military-grade weapons in order to fight the Colombian government and U.S. military in Colombia.  (*Id.* ¶ 13).  Mr. Smulian expressed his interest in aiding the FARC and assured them that Bout could provide the weapons that the FARC needed to carry out their fight.  Mr. Smulian received $5,000 as compensation for his travel and other expenses.

Ten days after the Curacao meeting, Mr. Smulian flew to Moscow to meet with Bout.  Once in Moscow, Mr. Smulian and Bout met over two days in the privacy of Bout's home and in his office.  During those meetings, Bout confirmed his ability to provide weapons, including surface-to-air missiles and Russian helicopters and equipment designed to interfere with the United States' ability to intercept the FARC's communications in Colombia.  Significantly, during one of their meetings in Moscow, Bout placed a telephone call to an individual Mr Smulian understood to be Peter Mirchev, a Bulgarian weapons manufacturer.  During that telephone call, Bout turned to Mr. Smulian and said that "a hundred pieces [are] available immediately," which Mr. Smulian understood to reference one hundred Igla surface-to-air missiles.  (Tr. 1250).

2

After his meeting with Bout in Russia, from late January through February of 2008, Mr. Smulian met with Snow and the confidential sources in Copenhagen and various locations throughout Romania.  During this time, Mr. Smulian served as a go-between, communicating payment logistics and proposed weapons delivery methods between the confidential sources and Bout.  Ultimately, Mr. Smulian arranged a meeting between Bout, the confidential sources, Snow and himself for March 2008 in Thailand to finalize the arms deal.

**B.**      **Cooperation with the Government's Prosecution**

On March 6, 2008, Bout arrived in Thailand and met in a hotel in Bangkok with Mr. Smulian and the confidential sources posing as representatives of the FARC.  At the conclusion of their meetings, Mr. Smulian and Bout were arrested by Thai authorities.  Immediately upon his arrest, Mr. Smulian agreed to cooperate with the U.S. Government.  After agreeing to cooperate, Mr. Smulian also voluntarily agreed to come to the United States in the custody of the DEA and face charges.  As Mr. Smulian recounts in his letter to Your Honor, "Once arrested and without hesitation I agreed to co-operate [sic] with the U.S. federal officers and take the full responsibility for my actions.  There was an option for me to stay in Thailand and fight extradition to the United States but I voluntarily chose to come to this country, face the consequences [sic], and offer my complete co-operation [sic].  This at great risk to myself and my family." (Ex. 2).

Upon arrival in the United States, Mr. Smulian waived his *Miranda* rights and his right to speedy presentment and voluntarily agreed to be debriefed by federal agents in a New York City hotel room.  On March 10, 2008, Mr. Smulian was presented before Magistrate Judge Michael H. Dolinger in the Southern District of New York, having been charged with one count of conspiracy to provide material support to a foreign terrorist organization.  Also, at the presentment, Mr. Smulian agreed to an order of detention.

Over the next months, Mr. Smulian continued to assist the Government in its investigation by:

1)   attending nearly twenty proffer sessions with the Government and federal agents;

2)   providing historical information regarding Bout's activities in Africa;

3)   assisting the Government in understanding the consensual recordings made during the sting operation;

4)   decoding emails between himself and Bout concerning the weapons deal; and

5)   supplying the Government with the details of his discussions with Bout during their private meetings in Moscow regarding the arms deals.

Little more than a month after Mr. Smulian began cooperating, the United States Attorney's Office announced that an indictment had been returned against Viktor Bout charging him with conspiracy to kill U.S. nationals, conspiracy to kill U.S. officers and employees, conspiracy to acquire and use anti-aircraft missiles and conspiracy to provide material support to a foreign terrorist organization.

On July 30, 2008, Mr. Smulian entered into a cooperation agreement, with the Government. That same day, Your Honor accepted Mr. Smulian's guilty plea to a criminal information charging him with conspiracy to kill U.S. nationals, conspiracy to kill U.S. officers and employees, conspiracy to acquire and use anti-aircraft missiles and conspiracy to provide material support to a foreign terrorist organization.

On November 16, 2010, thirty-two months after his arrest in Thailand, Bout was extradited to the United States to face charges arising from the arms deal. The following October, Bout proceeded to a jury trial before the Honorable Shira A. Scheindlin. In preparation for Bout's trial, Mr. Smulian had more than fifty meetings with prosecutors during which he listened to recordings, reviewed transcripts and deciphered emails that were exchanged with Bout. Significantly, Mr. Smulian was a key witness at trial. During his testimony which spanned three days, Mr. Smulian described his meetings and conversations with Bout and provided important details about the arms deal, including his agreement with Bout to supply the FARC with surface-to-air missiles and an arsenal of other weapons. Based in large part on Mr. Smulian's testimony, the Government swiftly and completely refuted Bout's defense that he sought to string along the DEA operatives with the prospect of an arms deal so that he could sell them two cargo planes. Simply put, Mr. Smulian's cooperation was crucial to the successful prosecution of Viktor Bout.

We understand that the Government will move pursuant to Section 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e), requesting that the Court grant a downward departure and providing the Court with the authority to impose a sentence below the statutory minimum in light of Mr. Smulian's substantial assistance in their prosecution and full compliance with the terms of his cooperation agreement. Accordingly, we discuss below the relevant factors that this Court may consider in determining the appropriate reduction to Mr. Smulian's sentence in light of his cooperation.

### 1.   Nature and Extent, Truthfulness and Timeliness of Mr. Smulian's Assistance

Mr. Smulian's cooperation could not have been more timely. As discussed above, he began to cooperate with the Government immediately upon his arrest in Bangkok. In fact, the timeliness of Mr. Smulian's cooperation with the Government is

underscored when contrasted with the costly and time-consuming conduct of Viktor Bout.  Arrested on the same day as Mr. Smulian, Bout fought extradition from Thailand, leading the U.S. Government on a prolonged extradition battle in the Thai courts.  The Government's initial extradition request was rejected in August 2009.  In August 2010, an appeals court in Thailand reversed the lower court's decision.  Then, after an additional three-month delay due to maneuvering by his legal counsel, Bout was finally extradited to the United States on November 16, 2010 – thirty-two months and eleven days after his arrest.

In addition, Mr. Smulian's cooperation was extensive.  Between March 2008 and November 2011, Mr. Smulian met with the prosecution over seventy-five times.  Throughout these meetings, Mr. Smulian took his responsibility seriously and worked earnestly to clearly explain his and Bout's criminal conduct.  In all his dealings with the prosecutors, Mr. Smulian was forthright and readily admitted his own serious misconduct.

Mr. Smulian was the Government's main witness at Bout's trial.  On the stand before Judge Scheindlin, Mr. Smulian testified truthfully and candidly for nearly three days about the crimes he committed, and Bout's role in those crimes.  On cross-examination, Mr. Smulian was attacked repeatedly and accused of lying.  He answered every question in a straightforward and honest manner and his demeanor remained calm and steady even when faced with emotionally charged questioning by defense counsel.  Mr. Smulian testified in the same spirit with which he engaged in the proffer sessions – truthfully, completely and reliably.[2]

## 2.  <u>Significance and Usefulness of the Assistance</u>

Mr. Smulian's cooperation was significant for three main reasons.  First, his cooperation was critical to the successful prosecution of Viktor Bout, widely recognized as one of the most notorious weapons dealers in the world.  According to the Government, Bout was "among the world's most successful and sophisticated arms traffickers, whose ability to transport all manner of weapons to conflict zones in Africa was so destructive and destabilizing that he was sanctioned by the United Nations and United States."  *See* Government's Sentencing Memorandum, *United States v. Viktor Bout,* 03 Cr. 365 (S.D.N.Y. Mar. 30, 2012).  Importantly, during his numerous meetings with federal prosecutors, Mr. Smulian described his critical meetings with Bout in Moscow in January 2008, providing key evidence to establish the criminal agreement between himself and Bout to supply surface-to-air missiles to the FARC and to kill American nationals.  Mr. Smulian's information about Bout was absolutely essential to charge Bout with the most serious offenses levied against him by the Government.

---

[2]  Notably, in a recent press interview, Peter Mirchev fully corroborated the accuracy of Mr. Smulian's trial testimony by acknowledging that Bout had called Mirchev to confirm the availability of 100 surface-to-air missiles while Smulian was present in Moscow. *See* Nicholas Schmidle, "Disarming Viktor Bout: The rise and fall of the world's most notorious weapons trafficker," *The New Yorker*, Mar. 5, 2012, at 60.

In addition, Mr. Smulian's testimony regarding the substance of his face-to-face conversations with Bout in Moscow was the cornerstone of the Government's evidence against Bout at trial. Throughout the trial and sentencing, Bout contended that he was merely a businessman who sought to sell cargo planes to the DEA operatives. Mr. Smulian's testimony, however, demonstrated that Bout's business was to traffic in arms. Due in large part to Mr. Smulian's testimony, on November 2, 2011 the jury convicted Bout on all counts. On April 5, 2012, Bout was sentenced to twenty-five years' imprisonment, which was the mandatory minimum sentence he faced.

Second,



Finally, the successful prosecution of Viktor Bout resulting from Mr. Smulian's cooperation has sent a powerful message both domestically and internationally that terrorist activity against the United States will be investigated and prosecuted aggressively and successfully. It was Mr. Smulian's cooperation in the Bout prosecution that brought this to bear.

### 3.   Danger or Risk of Injury to Mr. Smulian and His Family Resulting From His Assistance



As Mr. Smulian's daughter, states in her letter to Your Honor:

> My father's actions has [sic] caused a great amount of stress on our family; especially too my grandmother whom [sic] has last year turned ninety…. We had been worried (and still are) regarding the safety of our family and children as we have no idea to what extent the accused would go to keep my father from testifying or if he would consider revenge. (Ex. 3).

Mr. Smulian echoes these fears in his letter to Your Honor: "Since March of 2008 my incarceration has come at a heavy cost to me and my family. I fear greatly for my safety in light of my co-operation [sic] and my family all fear for their own safety

as well.  This has caused a marked change in my relationship with them, which will no doubt be forever….  Knowing that I have placed their lives and safety in jeopardy is a burden I shall bare [sic] for the rest of my life."  (Ex. 2).

## II.    MR. SMULIAN'S PERSONAL BACKGROUND

### A.    Upbringing, Education and Aviation Career

Mr. Smulian was born in England on March 21, 1941.  When he was eight years old, his family moved to South Africa, settling in Port Elizabeth in 1949.  Mr. Smulian spent most of his formative years in South Africa and he currently retains both British and South African citizenship.  Mr. Smulian's father is a retired officer of England's Royal Air Force and a flight instructor.  (PSR ¶ 46).

Mr. Smulian's formative years were spent in comfort and stability.  According to his mother, "He was brought up in a loving, warm, close-knit family environment."  (Ex. 4).  Mr. Smulian attended and graduated from a private boarding high school in South Africa.  After high school, he attended a technical college for about six months, but did not complete his program.  (PSR ¶ 48).  In 1959, at the age of eighteen, Mr. Smulian was drafted into the South African Air Force, serving in radio control communications and operations from 1961 until approximately 1966.  After his military service, he moved to Johannesburg, where he followed in his father's aviation footsteps and worked as a freelance pilot.  He became an air traffic controller and was ultimately promoted to the Airport Manager at Lanseria International Airport, a position he held from 1974 until 1983.

Building on his expertise and personal contacts, in 1974 Mr. Smulian became the owner and operator of a lucrative air cargo company called Interocean Airways.  At his company's peak, Mr. Smulian owned and operated a fleet of over a dozen cargo planes, which transported general cargo, primarily food aid, throughout the African continent.  In addition to food, Interocean occasionally transported weapons on behalf of various African governments.

Alongside his aviation career, starting in 1966 Mr. Smulian also worked as a paid asset for the South African government's military intelligence operations, where his primary responsibility was to conduct aerial surveillance of the military operations of "front line states" – the countries located adjacent to South Africa and opposed to its apartheid regime.  Though he worked for the South African government during this period in its history, Mr. Smulian disavows the ideology of apartheid.

### B.    Reversal of Fortune

In the late 1990s, Interocean Airlines fell on difficult times.  Due primarily to rising fuel costs and a long stretch of misfortune, Mr. Smulian sank approximately $150,000 into repair costs to try and keep his besieged company afloat, but to no avail.

7

He was ultimately forced to sell his once lucrative airliners for the cost of scrap metal and his business closed.

Between 2000 and 2007, Mr. Smulian reached out to contacts from the aviation industry and moved throughout various African countries, finding work in Rwanda, Uganda, and Tanzania. Gainful employment eluding him, he barely survived from one short-term engagement to the next. In his letter to Your Honor, he recounts this difficult time in his life, "By the year 2001 I was in a desperate financial state. Two thousand miles from my nearest family, essentially homeless and living on the margins of society." (Ex. 2). For some time, Mr. Smulian slept in an empty room in an office building that was owned by a friend. During a particularly difficult six-month stretch, he lived out of his car, storing all of his physical possessions in the trunk.

His family members provide vivid illustrations of his dire financial condition during these most challenging times. In his letter to the Court, his brother ███████ recalls a surprise visit by Mr. Smulian in 2004. "[Andrew] was looking very disheveled and drawn, and he told us that he was living out of his old car since he had nowhere to stay…. We were very concerned for his well-being but he assured us that he was OK and so there was not much more we could do." (Ex. 5). Concerning this same period of time, Mr. Smulian's eldest son ████████ writes in his letter to Your Honor, "Penny less [sic], stricken with illness and old-age [sic] catching up, he found refuge in an [sic] retirement home with some good old Samaritans and, with illness and only a loaned old bicycle for transport, the once proud standing business man and father spent his days as a helping hand and delivery boy on his bicycle to a small home industries shop in the east of [Johannesburg]." (Ex. 6).

Indeed, at the time of the instant offense, Mr. Smulian had reached the depths of his despair, as he explained in his letter to Your Honor:

> [I]n November of 2007 I was a broken and isolated person. There were days without food, no funds for medication, or any medical care, and with only a few personal items to my name I existed in extreme poverty earning some $300 a month. This period of my life was particularly difficult, extremely depressing and totally demoralizing. I was then sixty six years of age and could but look back at a successful career and ponder on how I had ended up in the state I found myself. (Ex. 2).

Even Bout recounted the grave state of Mr. Smulian's circumstances when he met him in Moscow in 2008.[4] Upon meeting him for the first time in several years at Sheremetyevo Airport in January 2008, Bout was utterly surprised at Mr. Smulian's physical state. (*Id.*). According to Bout, Mr. Smulian appeared disheveled and dirty and had arrived in Moscow in the dead of winter wearing nothing more than a short-sleeved shirt. (*Id.*). On

---

[4] Schmidle, *supra* note 2, at 60.

the way into town, Bout stopped to buy Mr. Smulian an overcoat, along with pants, shoes, neckties, and shirts.  (*Id.*).

Although it is no excuse for his criminal conduct, ⬛⬛⬛⬛⬛⬛⬛, Mr. Smulian's ninety year old mother also describes Mr. Smulian's difficult financial circumstances in her letter to the Court:  "Belatedly, I learnt that he had been struggling to keep his flying company going, but eventually I believe he lost everything, a shattering blow for someone at his stage of life.  I do not know how he managed to survive and can only conclude, that dire circumstances caused Andrew to fall prey to some incitement, because he is just not a bad or evil person."  (Ex. 4).

### C.    **Father, Grandfather, Husband, Brother and Son**

Mr. Smulian has found a sense of purpose in his role as father, grandfather, husband, brother and son despite his difficult circumstances.  Mr. Smulian has been married three times and retains a friendly and supportive relationship with his first two wives with whom he has raised four children, all of whom are productive adults with close ties to family and community.  His eldest son, ⬛⬛⬛⬛, is ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, his second child is a ⬛⬛⬛⬛⬛⬛⬛⬛.  His third child, ⬛⬛⬛⬛⬛⬛, is the ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Mr. Smulian's fourth child and ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛  In addition to these children, Mr. Smulian also helped to raise three stepchildren, each of whom he considers his own.

Mr. Smulian maintains warm and supportive relationships with his children and grandchildren.  He was committed to working hard to support his family when he had the means and letters from family members to Your Honor confirm that Mr. Smulian followed through on this commitment.  His daughter, ⬛⬛⬛⬛⬛⬛, speaks of Mr. Smulian as a caring and supportive father.  "He is a generous person who has supported us as children, paid for our education and medical aid and supplied us with transportation until we became self employed.  He is a gentle and friendly person who would go out of his way to help."  (Ex. 3).  His youngest son, ⬛⬛⬛⬛⬛ similarly recalls, "If a friend, family member or colleague was in need my father would always help out if he had the means.  He taught me to be independent from a very young age and he was always supportive even if I had the craziest ideas with wood, nails and a hammer in the garage."  (Ex. 7).  "Andrew Michael Smulian is my father and mentor," ⬛⬛⬛⬛⬛ writes. "He has shaped the person I have become today and for that I am grateful to him – I would not have it any other way." (*Id.*).

Moreover, Mr. Smulian's current criminal conduct stands apart from the many positive personal characteristics he has exhibited to his family and friends during his lifetime.  Mr. Smulian's sole living brother Timothy recalls an older brother who

9

"was a great part of my early life" and who shared hobbies and interests with him well into their adulthood.  "We both have a great interest in our Lithuanian family history and love for archeology and ancient relics."  (Ex. 5).  ████████, who has been extremely supportive of Mr. Smulian during his incarceration, explains in his letter to the Court: "My first reaction [ ] on hearing that [Andrew] had been arrested, was one of disbelief, and I still do feel that.  I know for sure that not one of us children would ever dream of willingly carrying out such a deed.  It is totally against what our whole family stood for." (*Id.*).  Echoing this sentiment, Mr. Smulian's son ████████ wrote that "[h]owever tragic this all is, and this mistake he has made, there is much much more to my dad…."  (Ex. 6). ████████ says of her father, "In essence, he is a gentleman with a caring, considerate nature."  (Ex. 16).  Likewise, Mr. Smulian's mother writes "I find [Andrew's] present situation difficult to accept, knowing him to be a loving, caring son."  (Ex. 4).

Mr. Smulian deeply regrets participating in the criminal conduct in this case and is particularly concerned about the risk of harm that his cooperation and incarceration has imposed on his family.  "[My incarceration] has caused a marked change in my relationship with them, which will no doubt be forever….  Knowing that I have placed their lives and safety in jeopardy is a burden I shall bare [sic] for the rest of my life."  (Ex. 2).  Despite the danger, his family is forgiving and continues to lend their support.  "I strongly believe that he is truly remorseful and sorry for causing upset to our family and given different circumstances a different road would have been travelled," says his son ████████.  (Ex. 7).  Without minimizing the significance of the crimes that his brother committed, Timothy simply states, "I feel deeply, in the circumstances, that Andrew does not deserve to be so totally isolated from his family, whom he now needs more than ever."  (Ex. 5).

## III.   A SENTENCE OF TIME SERVED IS APPROPRIATE UNDER THE CIRCUMSTANCES

### A.   <u>Applicable Legal Principles</u>

#### 1.   <u>Post-Booker Use of the Sentencing Guidelines</u>

In *United States v. Booker*, 543 U.S. 220, 226-27 (2005), the Supreme Court held that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment, rendering the Guidelines advisory.  Post-*Booker*, the Guidelines are considered a "starting point, [from which] to craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.'" *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) (quoting 18 U.S.C. § 3553(a)(1)).  The court is "free to impose sentences outside the recommended range."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).  The court "may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense."  (*Id.* at 189).

## 2.   18 U.S.C. § 3553(a) Factors

When sentencing an individual, a court is required to determine how best to comply with the primary directive of 18 U.S.C. § 3553(a) – to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. In making this determination, courts must weigh all of the § 3553(a) factors. *See Kimbrough v. United States*, 552 U.S. 85, 90-93, 100-01 (2007); *Booker*, 543 U.S. at 245-46. In addition to considering the § 3553(a) factors and the sentencing range set forth in the Guidelines, a court has the discretion to tailor sentences as it deems appropriate based on the "nature and circumstances of the offense and the history and characteristics of the defendant." *Cavera*, 550 F.3d at 187-88 (quoting 18 U.S.C. § 3553(a)). The court may also consider "all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

### B.   A Sentence of Time Served is Warranted in Light of § 3553(a) Factors

#### 1.   There is No Likelihood of Recidivism

##### a.   Mr. Smulian's Cooperation with the Government

As described in detail above, since his arrest in March 2008, Mr. Smulian has cooperated extensively with the Government in its investigation. In meetings with federal prosecutors, he provided valuable information about the criminal conspiracy in which he participated and he provided three days of trial testimony as a government witness in the October 2011 trial. Mr. Smulian's cooperation, we submit, is highly indicative that he will not recidivate. His cooperation demonstrates genuine remorse, an appreciation of the gravity of the crime, a desire to make amends for the public harm that his actions have caused and genuine disavowal of his criminal conduct in this case, rendering lengthy incarceration unnecessary.

##### b.   Mr. Smulian's Advanced Age

Mr. Smulian turned 71 on March 21, 2012. His advanced age strongly suggests that he will not pose a threat to the public by engaging in future criminal activity. According to a United States Sentencing Commission Report released in May 2004, "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." (Ex. 9 at 12). Significantly, the report concludes that, "Among all offenders under age 21, the recidivism rate is 35.5%, while offenders over age 50 have a recidivism rate of 9.5%." (*Id.*). The likelihood that Mr. Smulian, a 71 year old man, would re-engage in criminal activity is exceptionally low.

11

Thus, many courts have imposed non-Guidelines sentences on older defendants due to their low recidivism rates. *See, e.g., United States v. Hernandez*, 03 Cr. 1257 (RWS), 2005 U.S. Dist. LEXIS 10026, at *13 (S.D.N.Y. May 24, 2005) (imposing below-Guidelines sentence on defendant who was over 40 years old "on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."). *See also United States v. Carmona-Rodriguez*, 04 Cr. 667 (RWS), 2005 U.S. Dist. LEXIS 6254, at *10-11 (S.D.N.Y. Apr. 11, 2005) (same); *United States v. Carter*, 538 F.3d 784 (7th Cir. 2008) (affirming 24-month sentence for money laundering where Guidelines range was 87-108 months, based partly on conclusion that at age 61, defendant posed lower risk of recidivism); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-Guidelines sentence where district court's only reason for variance was that defendant's age made it unlikely for him to commit another crime upon release); *United States v. Hodges*, 07 Cr. 706, 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (considering a non-Guidelines sentence for 43 year old defendant based, in part, on "the inverse relationship between age and recidivism"); *United States v. Lucania*, 379 F. Supp. 2d 288, 297-98 (E.D.N.Y. 2005) (accounting for ages of two co-defendants, each over 70 years old, in granting non-Guidelines sentence; "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants"), *aff'd by United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008). A similar result is warranted in this case.

### 2.    Mr. Smulian's Reduced Life Expectancy Warrants a Non-Prison Sentence

Mr. Smulian suffers from a battery of chronic and serious medical conditions which are strongly correlated with significantly reduced life expectancy. He receives treatment for type II diabetes, chronic hypertension and high cholesterol.[5] Mr. Smulian's most significant health concern is his chronic and worsening diabetes. His blood sugar levels remain high and the poor management of this disease is believed to be the cause of his rapidly deteriorating vision (caused by retinopathy) and worsening circulation problems in his extremities. On November 16, 2011, Mr. Smulian registered a dangerously high blood glucose reading of 267 mg/dL. (Ex. 11).[6] Aware of this issue, starting in December 2011, Mr. Smulian started to meticulously document his own blood sugar levels.[7] As his records indicate, Mr. Smulian's blood sugar levels were within the normal range on only four out of ninety-eight occasions between December 31, 2011 and March 6, 2012. (Ex. 23). Long-term complications of diabetes with blood sugar levels this high increase cardiovascular problems including stroke, narrowing of the arteries and kidney damage. (Exs. 13-14).

---

[5] Exhibit 8 shows Mr. Smulian's medical history since his arrival at the MCC and a list of his medical prescriptions, as of December 13, 2011.

[6] According to LabCorp, the testing lab used by the MCC, a normal blood glucose reading is between 65 and 99 mg/dL.

[7] Exhibit 23 is a handwritten chart documenting Mr. Smulian's blood sugar levels from December 31, 2011 to March 6, 2012.

As with his diabetes, Mr. Smulian's hypertension is also chronic and worsening.  Even though Mr. Smulian takes four medications daily to combat his high blood pressure, his readings are frequently at dangerously high levels.  (Ex. 10).  On April 5, 2011, his blood pressure was 161/90 and previously in January 2010 it spiked to an alarming apex of 206/102.  (*Id.*).

Similarly, his cholesterol level remains high and unresponsive to treatment.  A sample of Mr. Smulian's blood test results from April 2008 to November 2011 show that he has maintained abnormally high levels of triglycerides and very-low-density lipoprotein (VLDL) cholesterol, both of which carry an increased risk of coronary artery disease.[8]  (Ex. 11).

As each of his chronic ailments carries its own treatment regimen, proper management requires strict adherence on Mr. Smulian's part and close medical supervision.  Each of the nine medications that Mr. Smulian is currently taking for his various conditions has its own side effects and the cumulative side effects have created additional medical concerns.  In recent months, Mr. Smulian has experienced tremors in his face, chest and both arms, which physicians have preliminarily attributed either as a consequence of his multiple prescriptions or the early onset of Parkinson's disease.  (Ex. 8).

As a result of his advanced age and chronic medical conditions, Mr. Smulian's life expectancy has been significantly reduced.  According to data published by the Social Security Administration, a seventy-one year old male has a period life expectancy of 13.08 years.  (Ex. 17).  The period life expectancy at a given age represents the average number of years of life remaining if a group of persons at that age were to experience the mortality rates for 2007 over the course of their remaining life.  (*Id.*).  Numerous medical studies, however, have established that diabetic patients have a shorter life expectancy than non-diabetic individuals largely due to a higher incident of cardiovascular complications resulting in death.  *See, e.g.,* Ken Gu et al., *Mortality in Adults with and without Diabetes in a National Cohort of the U.S. Population, 1971-1993*, 21 Diabetes Care 1138 (1998); Nick A. Roper et al., *Excess Mortality in a Population with Diabetes and the Impact of Material Deprivation: Longitudinal, Population Based Study*, 322 British Med. J. 1389 (2001).

For example, the *European Heart Journal,* a well-respected peer review medical journal, published a study in 2009, assessing the impact of various risk factors on estimated life expectancies of more than 3,600 patients in the United Kingdom.  (Ex. 14).  This study found that 55 year old men with type II diabetes and risk factors such as high blood pressure and high cholesterol have a life expectancy of only 13.2 years, as opposed to a life expectancy of 24.7 years for the general UK male population.

---

[8]  Mayo Clinic cardiologist Thomas Behrenbech, M.D., Ph.D., explains that high VLDL may cause increased risk of cardiac arrest or stroke.  *See* http://www.mayoclinic.com health/vldl-cholesterol/AN01335.

Similarly, in a 2007 study of 9,033 subjects published in the *Archives of Internal Medicine*, researchers at the Erasmus University Rotterdam and the Harvard School of Public Health found that the life expectancy of older diabetic men (*i.e.*, 50 years old and older) was 7.5 years shorter than that of their non-diabetic counterparts. (Ex. 13). Accordingly, Mr. Smulian's life expectancy is significantly reduced as a result of his chronic type II diabetes, high blood pressure and high cholesterol.

Courts have considered reduced life expectancies in granting non-prison sentences for defendants suffering from various medical ailments. *See, e.g., United States v. MacFarlin*, 535 F.3d 808 (8th Cir. 2008) (granting 54 year old defendant three years probation rather than 60 months' Guideline term of imprisonment due to serious health problems, including anxiety, depression, nervous disorders, heart disease, high blood pressure and diabetes, and significantly reduced life expectancy); *United States v. Coughlin*, 06 Cr. 20005, 2008 WL 313099, at *4 (W.D. Ark. Feb. 1, 2008) (granting sentence of probation and home detention rather than 27-33 months' Guideline sentence due to "mountain of medical history that makes clear the unlikelihood of [defendant] surviving incarceration," including cardiac problems, hypertension, diabetes, obesity and high blood pressure).

Even when prison sentences have been deemed appropriate, courts have imposed below-Guidelines range sentences for defendants suffering from serious medical ailments like Mr. Smulian's. *See, e.g., Carmona-Rodriguez*, 2005 U.S. Dist. LEXIS 6254, at *4 (granting 54 year old defendant with high blood pressure and diabetes variance from mandatory minimum under Guidelines; "[i]n view of…[defendant's] need for ongoing medical monitoring and treatment, it is determined that a non-Guidelines term of incarceration is warranted"); *United States v. Nellum*, 04 Cr. 30, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting 57 year old defendant variance from Guidelines in part because of serious medical problems, including high blood pressure, a blocked prostate and heart problems). *See also United States v. Brown*, 10-3927, 2011 WL 2036345, at **3 (3rd Cir. May 25, 2010) (vacating lower court's sentence in part because defendant's age and cardiac problems were not sufficiently considered); *United States v. Ryder*, 414 F.3d 908, 920 (8th Cir. 2005) ("[C]oupled with the requirements of § 3553…, the district court would be well within its discretion to at least consider [the defendants'] ages and medical conditions as non-Guideline factors on remand").

Statistically speaking, Mr. Smulian is living on borrowed time. Given his reduced life expectancy, a term of imprisonment of even modest length would effectively condemn him to a term of life imprisonment. Such a term would be "greater than necessary" to advance the goals of sentencing. We submit that Section 3553(a) dictates that a variance is warranted to ensure that Mr. Smulian does not spend his final days in prison.

14

### 3.      Self-Motivated Path to Rehabilitation

Mr. Smulian has made every effort to improve himself during his incarceration.  Demonstrating his commitment to honest work, he has worked in the laundry room at the MCC despite not feeling well and is often consulted when the washing machines malfunction, calling upon his experience as an airplane mechanic.  Explaining his motivation in his letter to Your Honor, Mr. Smulian himself notes, "I have worked tirelessly in the laundry of the special housing unit, completing some 3050 plus hours of duty.  350 of them from midnight to 6 am.  This has been for no reward other than to show me that doing a good job at honest work is the bedrock to self esteem."  (Ex. 2).

In addition, during his time in prison, Mr. Smulian has devoted himself to the development of his intellect, character and spiritual self.  "I have read some 437 books, many dealing with the lives of accomplished people, Lincoln, Mandela, and Gandhi for example."[9]  (Ex. 2).  While in pre-trial detention, he has also undertaken the study of two languages, Latin and Hebrew, and is now preparing to take on a third: Greek.  On the issue of spiritual development, Mr. Smulian notes, "I have further been counseled by the MCC chaplain who has also given me a number of articles on faith, spiritually enspiring [sic] books and a complete book on the catechism.  All these and our discussions have certainly strengthened my faith, and assisted me greatly in redefining myself and my ways."  (Ex. 2).  Fully dedicated to self-improvement, Mr. Smulian has not been involved in any disciplinary proceedings during his incarceration and has received praise from prison authorities for his positive attitude and influence on the improved conditions within his cell block.

His self-motivated moral and spiritual development has provided him with the proper perspective from which to view his past actions and their impact on those around him.  "These past almost four years have been a time of extreme torment, unhappiness and misery, and I have suffered a great deal knowing full well that my actions have hurt, dissapointed [sic] and allienated [sic] so many family members, friends and other associates."  (Ex. 2).  He recognizes the significance of his crimes and feels genuine remorse.  "I owe an apology to the peoples of the United States of America and to the people of the Republic of Colombia for my deeds, and can be most thankful that no person was hurt by the crimes I committed."  (Ex. 2).[10]

---

[9]  Interestingly, Mr. Smulian kept a detailed list of the books that he has read while detained.  His prison reading list is a unique selection of fiction and non-fiction which provides insight into his broad range of interests.  Perhaps appropriate to the circumstances, among the first books he read in the SHU were *The Bible*, the *Complete Works of William Shakespeare* and a stress management book.  A copy of that list is attached as Exhibit 15.

[10]  While Mr. Smulian commends the fairness and honesty of U.S. law enforcement officers and federal prosecutors in his letter to Your Honor, Bout has publicly expressed strong views to the contrary during a post-trial interview.  In the March 5, 2012 issue of *The New Yorker*, Bout assails the integrity of U.S. federal agents ("The D.E.A. has become worse than drug dealers.  At least drug dealers have ethics.") and

In short, Mr. Smulian has been a model prisoner during his detention and he has used his time to better himself with the ultimate goal of being able to return to society, take care of himself and to contribute to the well-being of his family as needed. Such self-improvement and goal-oriented behavior are the marks of a repentant man, and lengthy incarceration is unnecessary given these characteristics. *See United States v. Castillo*, 03 Cr. 835 (RWS), 2007 U.S. Dist. LEXIS 7422, at *22 (S.D.N.Y. Jan. 25, 2007) (imposing a below Guidelines sentence in part because defendant had taken efforts at self-improvement, including gainful employment, while in prison and noting that "[a]n overly-long prison sentence could therefore prove counterproductive in light of [the defendant's] efforts at self-improvement").

### 4.      Time Served in SHU is Sufficient Punishment

Mr. Smulian has served more than four years in solitary confinement in the SHU of the MCC during pre-trial detention. Unlike other inmates, he has not had the ability to exercise, eat meals with other people, or share even the most basic social interactions. He has endured these conditions without incident and by making the most of his circumstances. Nevertheless, these harsh conditions by their very nature have been difficult and have taken a physical and emotional toll on him.

Amplifying Mr. Smulian's isolation is the fact that he has not received a single family visit during his time at the MCC. Most of his relatives reside in ██████ and in ██████ and are of modest economic means, rendering a visit to the United States virtually impossible. His daughter, ██████, explains the pain of not being able to be physically present for Mr. Smulian at this time: "Our family are [sic] very sadden [sic] by our father being so far away and us not being able to visit him especially now that my children has [sic] grown a little and would like to get to know there [sic] grandfather. ██



██████ (Ex. 3). Since March 2008, Mr. Smulian has counted his attorneys as his only visitors. His brother believes that his isolation would only persist with more prison time. "Should he be given a prison term, it would prove extremely difficult to bring from ██████ either our ninety year-old mother, his two sons or his youngest daughter, to the United States to visit him." (Ex. 5).

---

questions the fundamental legitimacy of the American legal system ("This is not justice. It's a minefield.... You're living in a police state.") Says Bout, "I did nothing in my mind that qualifies as a crime. Sure, I was doing transportation of arms. But it was *occasionally*. Three hundred and sixty days were normal shipments. For five days, I shipped arms and made a couple of hundred thousand dollars." *See* Schmidle, *supra* note 2, at 65. Likewise, in the sentencing memorandum submitted on his behalf, Bout reiterated these views by asking Judge Scheindlin to decline to sentence him and "thereby become an unwilling party in his unlawful prosecution...." (Ex. 1). He further argued that he was unfairly prosecuted "for a non-crime concocted by agents of the United States Government" based on malice stemming from the White House. (*Id.*).

Courts in this district have considered the harsh conditions of a defendant's pre-trial confinement at the MCC when fashioning an appropriate sentence. *See, e.g., United States v. Behr*, 03 Cr. 1115 (RWS), 2006 WL 1586563 at *5 (S.D.N.Y. June 9, 2006) (granting a sentence of time served rather than 37 to 46 months' Guideline term for defendant who served 29 months at the MCC, a "pre-trial detainee institution that is not designed for long-term stays"). In *United States v. Stephanou*, 09 Cr. 467 (RJS) (S.D.N.Y. Dec. 22, 2010), for example, Your Honor granted a sentence of time served rather than 70 to 87 months' Guideline term due to various factors, including defendant's cooperation and over 19 months of pre-trial detention at the MCC. In rendering that decision, Your Honor explained that the MCC is "a tough place to do time" and "not the type of place that [defendant] would serve a sentence if [he] had started serving after [he was] sentenced by the Court." (Ex. 22). Similarly, in *United States v. Mendola*, 03 Cr. 449 (KMW) (S.D.N.Y. Sept. 30, 2005), Judge Wood granted a 10-month downward departure equal to one-third of the time the defendant spent at the MCC based on the harsh conditions of his pre-trial confinement. (Ex. 19). Finally, in *United States v. Pajcin*, 05 Cr. 1284 (VM) (S.D.N.Y. Jan. 18, 2008), Judge Marrero imposed a sentence of time served based on numerous factors, including defendant's cooperation and 20 months served in pre-trial detention at the MCC, "a maximum detention facility without the rehabilitation and other facilities available in other federal prisons." (Ex. 20).

Arguably, Mr. Smulian's conditions of pre-trial detention are even more severe than those noted in the cases above because he has been housed in the SHU in a one-man cell in which he eats, sleeps and washes. Significantly, Judge Scheindlin recently recognized the unduly harsh conditions in the SHU by granting Bout's request to be transferred from solitary confinement to the general population at the MCC. Citing conditions similar to those faced by Mr. Smulian – including "very little natural light or fresh air," "limited access to commissary," "one telephone call per month" and "no interaction with other prisoners" – Judge Scheindlin recognizes that "it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." *United States v. Bout*, 08 Cr. 365 (SAS) (S.D.N.Y. Feb. 24, 2012) (citation omitted). Given that Mr. Smulian has served four years under such difficult and harsh conditions in the SHU at the MCC, we submit that time served is sufficient punishment and no additional prison time should be imposed.

**5.      Mr. Smulian's Cooperation
Warrants a Sentence of Time Served**

Courts have frequently imposed significantly reduced sentences on cooperating defendants who have pleaded guilty to terrorism-related offenses and rendered substantial assistance to the Government. In particular, defendants in the following actions provided substantial assistance to the Government and received substantially reduced sentences ranging from time served to 57 months' imprisonment.

17

- *United States v. Babar*, 04 Cr. 528 (VM) (S.D.N.Y. June 3, 2004):  Mohammed Junaid Babar was an American jihadist who set up terrorist training camps in Pakistan where the leader of a group of suicide bombers learned to manufacture the explosives that claimed 52 lives and wounded hundreds of others in the 2005 London suicide bombings.  Babar also provided the highest ranking members of Al Qaeda with money and equipment, ran weapons, and planned two attempts to assassinate former president of Pakistan, General Pervez Musharraf.  On June 4, 2004, Babar pled guilty to a five-count Information in which he was charged with four counts of providing and conspiring to provide material support to a foreign terrorist organization, namely Al Qaeda, and to terrorist activity, in violation of 18 U.S.C. §§ 2339B and 2339A, and one count of making a contribution of funds, goods and services to, and for the benefit of, Al Qaeda, in violation of 50 U.S.C. § 1705(b).  Following his plea, Babar remained detained until December 18, 2008, when he was released on bail.  Babar cooperated with the Government and received a 5K1.1 letter at sentencing.  In light of his cooperation, Babar was sentenced on December 10, 2010 to time served (which was approximately 4 years and 8 months in custody) by Judge Marrero.  AUSA Brendan McGuire was among the prosecutors who had responsibility for Babar's prosecution.  (Ex. 28).

- *United States v. Barrera-De Amaris, et al.*, 03 Cr. 182 (S.D. Tex. May 21, 2003):  This case involved defendants attempts to procure $25 million worth of weapons for the terrorist organization Autodefensas Unidas de Colombia ("AUC") in exchange for cocaine.  Elkin Alberto Arroyave-Ruiz and Edgar Fernando Blanco-Puerta, both purporting to be high-ranking members of the AUC, were arrested in a sting operation in Costa Rica, while they were preparing to inspect a purported cache of weapons which were part of this transaction.  Simultaneous with that operation, broker Uwe Jensen was arrested in the United States in connection with his role in the conspiracy.  In addition, Fanny de Barrera-De Amaris was arrested for inspecting a cache of weapons on behalf of the AUC and Carlos Adolfo Romero-Panchano was arrested based on his solicitation of AUC members to participate in the weapons-for-drugs deal.  All of these defendants were indicted for conspiring to provide material support or resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B; Arroyave-Ruiz, Blanco-Puerta and Jensen were also indicted for a drug conspiracy.  Romero-Panchano cooperated with the Government and received a 5K1.1 letter at sentencing.  In light of his substantial assistance, Romero-Panchano was sentenced to 36 months' imprisonment.  (Ex. 24).

- *United States v. Shah, et al.*, 02 Cr. 2912-L (S.D. Cal. Oct. 30, 2002):  The defendants were charged with conspiring to provide material support to Al Qaeda, in violation of 18 U.S.C. § 2339B, and drug charges, in a scheme to trade heroin and hashish for Stinger anti-aircraft missiles.  From April through September 2002, the defendants negotiated with undercover law enforcement agents for the sale of 600 kilograms of heroin and five metric tons of hashish.  The defendants also negotiated to purchase four Stinger anti-aircraft missiles, which the defendants indicated they were going to

sell to members of Al Qaeda in Afghanistan.  Afridi and Ali each pled guilty to drug and material support charges, and cooperated against Shah.  On April 3 and 10, 2006, Afridi and Ali, respectively, were each sentenced to 57 months' imprisonment in light of their cooperation.  Defendant Shah was sentenced to 225 months' imprisonment. (Ex. 25).

•   *United States v. Royer, et al.*, 03 Cr. 296 (E.D. Va. June 25, 2003), *see United States v. Khan*, 309 F. Supp. 2d 789 (E.D. Va. 2004) (ruling on co-defendants' motions for judgment of acquittal):  This case involved defendants who were members of the Dar al-Arqam Islamic Center in Falls Church, Virginia, and who participated, in 2000 and 2001, in paintball and paramilitary training with the encouragement of Dar al-Arqam's spiritual leader, Sheikh Ali Al-Timimi.  Soon after the terrorist attacks of September 11, 2001, a meeting was held at the home of defendant Yong Ki Kwon.  During this meeting, Sheikh Al-Timimi encouraged those in attendance to go to Pakistan to receive military training from Lakshar-e-Taiba (LET), to be able to fight against American troops soon expected to arrive in Afghanistan.  This encouragement was significant enough that four of those who attended this meeting, including Kwon and defendants Khwaja Mahmood Hasan, and Mohammed Aatique, left the United States and traveled to a LET training camp less than a week after this meeting.  Kwon, Hasan and Aatique each pled guilty to terrorism charges, including conspiracy, transfer of a firearm for use in a crime of violence and commencing an expedition against a friendly nation.  Each cooperated with the Government and provided substantial assistance, including by testifying at one or more terrorism trials.  In light of their cooperation, Kwon was sentenced to 38 months' imprisonment, Hasan to 37 months, and Aatique to 38 months.  Defendant Royer pled guilty to two terrorism-related charges and was sentenced to 240 months' imprisonment.  (Ex. 26).

•   *United States v. Ujaama*, 02 Cr. 283 (W.D. Wash. Aug. 28, 2002):  Earnest James Ujaama was indicted on one count of conspiring to provide material support to a foreign terrorist organization (Al Qaeda) and to terrorist activity, in violation of 18 U.S.C. §§ 2339B, 2339A, & 956, and one count of using, carrying, possessing and discharging firearms during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) & 2.  The charges alleged that Ujaama and his unindicted co-conspirators attempted to set up an Al Qaeda terrorist training camp in Oregon.  As part of an agreement that requires him to continue cooperating with the Government for ten years, Ujaama pled guilty to conspiring to supply goods and services to the Taliban, in violation of the International Emergency Economic Powers Act (IEEPA).  His cooperation, which is ongoing, has led to charges against a number of other individuals.  Ujaama was sentenced, on February 13, 2004, to two years' imprisonment.  (Ex. 27).

            Accordingly, we submit that this Court should sentence Mr. Smulian to time served (49 months) so as to avoid unwarranted disparities with the sentences

imposed on other defendants who cooperated with the Government in other terrorism-related cases.

## IV.     CONCLUSION

Mr. Smulian is deeply remorseful for his actions.  He has provided substantial assistance to the Government in its prosecution of Viktor Bout.  Also, we submit that in sentencing Mr. Smulian, the Court should take into account his low likelihood of recidivism, his self-motivated rehabilitation during incarceration, the punitive effect of his time already served, and the likelihood that, given his reduced life expectancy, further incarceration would effectively constitute a term of life imprisonment.  For these reasons, we respectfully request that the Court impose a sentence of time served.

Dated:          New York, New York
                April 9, 2012

                                    Respectfully submitted,

                                    FRIEDMAN KAPLAN SEILER &
                                       ADELMAN LLP


                                    /s/ Mary E. Mulligan
                                    Mary E. Mulligan
                                    7 Times Square
                                    New York, NY 10036-6516
                                    (212) 833-1100

                                    *Attorney for Defendant Andrew Smulian*